Case number 17-1276 et al. National Postal Policy Council petitioner versus Postal Regulatory Commission. Ms. Kan for the mailer petitioners, Mr. Belt for the petitioner U.S. Postal Service, Ms. Birsvang for the respondent. Good morning. Good morning, Your Honor, and may it please the court. My name is Aisha Khan and I am here on behalf of the mailer petitioners. This case raises three sets of issues. I'd like to start with the threshold question. Ms. Khan, can you speak more directly into your phone? Yes. Is that better? Yes. Thank you. Okay. Okay. So what I was saying was that this case raises three distinct sets of issues, and one of them is a threshold issue, which is the statutory interpretation question of whether the system to be modified or replaced under section 3622D3 is the regulatory system or both the regulatory system and the statutory requirement. The other side's case essentially boils down to this, that the alternative system, the ability to adopt an alternative system in that statutory provision conveys the broad unilateral authority to wipe out the statutory requirement. There are several reasons why that is plainly incorrect, but I would like to speak to two of them. The first is that it is inconsistent with the text of the statute, not only with the words requirements and the word shall in D1 and D2, but also with subsection D3 itself, and in particular, with the language that the power to modify or replace the system applies to the system established under this section. I'd like to point the court to telecommunication. Did the regulatory system that the commission adopted include the price cap? Does the regulatory system include the price cap? The regulatory system that they adopted includes a price cap because the price cap is a statutory requirement. My point in asking the question is, telling us there's a difference between the regulatory system and the statutory system doesn't tell us anything if they both include the price cap. It includes the price cap only because the statute imposes the price cap as a requirement. The price cap requirement itself is not part of the system. The price cap requirement is rather than under the statute. In telecommunications research and action center, a very similar situation was presented. That was the statute in which the language said the obligation imposed under the statute. That was the language there. The question was whether that referred to the statutory requirements or to what the FCC had done. It was about the fairness doctrine and the obligation related to the obligation to give equal time to competing viewpoints on issues of public importance. The court said that because the statute used the word, the words imposed under this section, that meant it was referring to what the FCC had done rather than to what the statute itself had done, rather than the statutory obligation. That's exactly what we have here. Here's the problem I have. Let me just explain to you. I think the most difficult issue we face is this. Maybe you could just tell me what the answer is. You've alluded to it. During the first 10 years, the commission's power is limited to modify. After that period, it can modify and adopt such alternative system as necessary. It only imposes one requirement on that alternative system that it's necessary to achieve the system. Under your interpretation, the phrase adopt such alternative system plays no role in the statute. That's the biggest problem I have with this. That is with your argument. It just seems to me that the statute so clearly gives the commission more power after the 10-year period than it did in the first. That additional power is the power to modify with only one limitation. That limitation is not the price cap. That's what bothers me about your argument. I can't get around. I hear you. I will admit that it gives more power, but that's a different question than whether that enhanced power extends to the ability to jettison the statutory requirements. Let me try to explain why. If you look at section D3, it has two sentences. The first sentence is, review the system to make sure it's meeting the objectives, the system established under this section, and see if it's meeting the objectives. That's clearly not surplusage. That power, the obligation to look at the system 10 years later would not otherwise have been required. If you look at the second sentence, it then says you can either modify or replace. I'm using replace as the shorthand for adopt an alternative system. That too is not surplusage because all that says is you can take a bold approach or you can take an incremental approach. It allows, it authorizes the commission basically to throw out the system it adopted under section A, which was an establishment of a system in the first place that complied with the statutory requirements. Take a bold approach, take an incremental approach, but the bold approach would not have been authorized under section A. Section A was to adopt a system, but not necessarily every year to throw out the system that you adopted under A and then replace it with something else every year for 10 years, which would have been too disruptive on the postal system. I don't think that the fact that it has to undertake a review and then can take a bold approach that starts afresh means that D3 is somehow surplusage. I also think that interpreting D3 to allow the commission basically to throw out, throw to the curb the entire statutory boundary that Congress established in the PAEA defies common sense. Congress in 1792 has set the ceiling for postal rates. It did it in the beginning by actually setting postal rates, $0.06, $0.25, depending on distance back in 1792. It does it again in the PRA in 1970 when it says we're going to impose a cost of service ceiling on increases. Then it, for four to five years, negotiates about what's the right policy choice in 2006 when it enacts the PAEA and it says we are going to impose a CPI price cap. That's going to impose the ceiling and it prioritizes... Do you think Senator Collins misread the statute? I do, Your Honor. I think that relying on Senator Collins' statement really... She misinterpreted the statute. I think she misinterpreted it. Let me try to explain why. Both the House bill and the Senate bill had a price cap. Both of them had a CPI price cap very clearly. We have alerted the court to that with our supplemental authority filing. I think it defies complete common sense to think that Congress would have adopted a statute that would have allowed a CPI price cap to be thrown out completely. The way the PRC and the USPS... Let me just ask you, isn't that pure speculation on your part? Congress, when the House and Senate adopt different provisions, call a conference, and during the conference, there's nothing of which I'm aware that would require the conference report to maintain a price cap. Judge Tatel's question, it seems to me, has to be answered in light of the power under congressional rules during a conference, a House-Senate conference, to come up with a new piece of legislation. Now, there are all kinds of procedural objections that might be raised, but none are present in this case. So both the Senate and Congress, and at least according to Senator Collins, and indeed the Commission's brief, came up with this compromise. Keep it for 10 years, and then having limited the authority of the Commission by setting out the standards in great detail, said, if the Commission finds that the current system is not working, then it has the authority to adopt a new system. So back to Judge Tatel's question, how can the Court conclude that Senator Collins, speaking on the floor, has misinterpreted what the conference committee adopted? I think there are several aspects to legislative history. First of all, there's no conference report in this case. So all we have are the House bill that was passed by the House, the Senate bill that was passed by the House, and Collins' statement. That is all we have. So we actually have the bill that came out of conference. Of course. And for some reason, you want to ignore that. No, Your Honor, I am not asking you to ignore that. I'm asking you to interpret that in a way that's consistent with legislative history and with the language of the statute. Do we have any legislative history that was contemporaneous with Senator Collins' statement indicating that she had misinterpreted what the conference bill did? No, Your Honor, we do not have that. But what we do have is case law that when it does rely on Senator's statement, it looks for other confirmation of that interpretation. So the other side has been unable to cite a single case where a sole Senator's statement addressed an issue and then the court relied on it to interpret the statute. Usually you have all kinds of other statements or other aspects of legislative history, committee reports, conference reports. And what you have instead in this case is the only reports that are out there relate to statutes that the court must speculate. No, Your Honor, I am not asking you to speculate. I am asking you to look at the statutory language, which refers to a system established under this section. And I'm asking you to look at the history of congressional action in this area. And I'm asking you to look at the fact that both bills that led to this statute included a price cap. And when you put all of that... One of the problems I have with your statutory analysis, which hinges on established under, is you assume that language established under refers to the commission doing the establishment. But there's no reason for that not also to refer to Congress. If established under, it refers to both the commission and Congress itself, then you lose. Well, Your Honor, I think... If it refers to both the statutory requirements and the regulatory system, then yes. I'm talking about the actors. The actors here are either Congress or the commission with respect to the system. And if that D3 refers to both, then you can't prevail. Yes, Your Honor, but I think it can't refer to both. Because if you look at 3622A, it uses the word establish a system. And then you see that same language. You see established under this section. And then lastly, I think if Congress meant in D3 that you could throw out the entire statutory bound, the policy judgment, then it would have said, evaluate whether the system is meeting the requirements. It would have referred to the requirements as being up for reconsideration. Sorry, I said that wrong. It would have said, are the requirements meeting the objectives? But that's not what it says. It says, is the system established under this section meeting the objectives? And there was a great deal that the commission did back in 2006. It went through two rounds of notice and comment, took 10 months, issued dozens of pages of regulations. There was a whole host of issues that were up for consideration. They could have adopted for a particular product because the price cap only applies to classes. And the price cap in the House bill was even tighter. It applied to subclasses. So all the products in a particular subclass could not increase in price by more than CPI. So it was even tighter than the Senate bill. But even so, the statute as enacted gave the deal in regulating postal rates and the postal system. I see that I am well into my rebuttal time. So if the court- I actually have a couple of questions about your arbitrary capricious argument. So let me just put my question in perspective. You make a lot of arguments in your brief. And your brief is good. You make a lot of arguments in your brief. But what struck me reading the briefs is that all of the arguments, they implicate three basic principles that require deference by this court. The statute requires the commission to balance nine different objectives, some of which are technical. And it's predictive. And any one of these alone would require us to defer to the commission. And all three of them are present in this case. So my question is to you, of all the arguments you've made, could you start with the one that you think is- given the deference, and I assume you don't disagree with what I just said about the commission and our deference to decision here- what is your best argument, given the deference, that this court could conclude that the commission's order here is arbitrary? What's your best argument? I think my best argument has to do with predictable and stable rates. And it is that earlier in this same docket, the commission looked at the possibility of what was then a 5.7 percent one-time increase. And this was designed to- was effectively at that point what I will call a rate reset. And they said that would create, I'm going to quote for you, a shock to the system. You're focusing on one of the statutory factors, right? Predictable rates. So this is objective two, predictable and stable rates. Yes. So the commission decided that this proposal, which the commission itself had come up with and was considering, of a 5.7 percent increase above CPI was, quote, well outside the industry's experience under the PAEA system of rate making and gave mailers a to make adjustments. And instead what it proposed, at that point it was in the proposal phase, it was in order 4258, what it proposed instead was we're going to adopt a 2 percent increase for five years because, as they put it, that reflected regular and stable timing and magnitude that would allow mailers to plan. So that's what they said. They felt like it was too dramatic. And then what they did in the end was to adopt a formula, a density formula and a retirement authority formula that led to exactly the same one time price increase. It was 5.6 when you combine the 4.5 density and the 1.1 retirement, you come up with a 5.6 percent increase above 60, above CPI to go into effect all at once. And they never reconciled. And they were so unable to predict what the authority would be. They used words like this is a very modest proposal, we're going to look at what it would have been in the last many years, it would have averaged one percent. I hear what you're saying about that, but here's my problem. You're focusing on one factor here. And the commission had all of these other factors to balance. In fact, you know, your argument, you've made exactly the argument I would expect you to make, that the commission should have balanced some of these factors differently and in your favor. And the Postal Service looks at the same factors and argues that the commission should have balanced them differently. But what we have here is, and everybody agrees that the commission considered the factors, took them into account, made a judgment. And it's very hard for me to see how we can second guess that. I just, that's my problem. Well, in other words, I don't think you can make your case by focusing as much as you do on just one factor when the commission considered them all and the Postal Service is arguing just the opposite. And that's what I'm looking for from you. I'm looking for some way in which I could conclude that the way in which the commission balanced the factors, the way in which it considered and balanced the factors was still arbitrary and capricious. It seems to me that's the case you have to make. Yes. And I think I have several responses to that. The failure to reconcile what they did with respect to predictable and stable rates with internal inconsistency within the same docket has been found to be arbitrary and capricious by this court. With respect to balancing the objectives, part of the problem here is that they ignored some of them. So for example, maximizing incentives to reduce costs and increase efficiency. The commission found that the Postal Service had not met many of its own cost savings projections. It had pricing inefficiencies. Its productivity had declined in each of the past five years. It found that incentives, which is objective one, were not maximized and that the service standards objective, which is objective three, was also not maximized, was also not accomplished. But then they adopted authorities that did nothing about any of that. Nothing. Ignored it completely. None of the money they get needs to go to improvement. They receive the full amount of cost attributable to volume decline. Even the portion caused by poor service, or even the portion that would have been ameliorated by inefficiencies. And so what they've done is they've rewarded the decline. We had a leading economist on pricing regulation, Robert Willig, explain how what that does is it simply rewards service declines. More declines, more money. And it's irrational to ignore the central issue that animated the PAEA, which was to impose a ceiling to drive down costs. And all of this highlights why that ceiling is so important. Because Congress made a policy judgment that putting a ceiling on postal rates forces what was the number one policy objective, which was to engender cost efficiencies. And when you lift that ceiling, and mind you, because of this idea of balancing, it's very hard to apply the statute. I think this is why we raised the delegation argument. Once you lift that ceiling, the whole world is open to you. Because this year it was a price cap plus. Next year... I'm sorry to ask the question this way, but were you really... I guess you were serious about the non-delegation argument. I mean, how could you have a non-delegation problem when the statute has nine different factors that the agency's supposed to balance? I mean, compare that to American trucking. Do you know what the statute in American trucking said that the court said had no non-delegation problem? Yes, your honor. Requisite to the public health. That's it. To protect public health. Requisite to the public health. No non-delegation problem. Here you have a statute that, in addition to generic language like that, tells the commission to balance nine separate factors. Your honor, the problem is... Yeah, what? The problem is, I understand the non-delegation doctrine is not especially robust. But what we don't have in Whitman trucking is a situation where the objectives point in all different directions. They are entirely in tension with one another. That wasn't true in Whitman trucking. So imagine if in Whitman trucking, not only did it say adopt standards that are necessary, requisite to public health, but it also said, and show discretion to state rules on pollutants, or also enhance industry efficiency. Just to cut this short for just a minute, because I have just a couple of quick questions. But I think that's an argument you have to make in the Supreme Court. All we have is American trucking. This is a lower federal court. And I don't know of any case that you've cited. I don't know of any case myself that would support finding a non-delegation problem here. But let me just ask you, I just have three quick fact questions for you. That's all. Are mailers of market-dominant products captive customers? I'm sorry, are they what with customers? Are mailers of market-dominant products captive customers? Captive customers. Sorry, Your Honor. I couldn't understand if you were saying at or captive. Captive. Captive. Well, for the vast majority of the products, yes. Okay. Question number two. The mailers have some estimates of price elasticity in their comments. Were they based only on market-dominant products? Yes. The price elasticity models that the Brattle Declaration relied on were the postal services pricing elasticity numbers. And then on top of that, they ran a regression to show that the density factor increases. My question was, those were only based on market-dominant products. Correct? Yes. I believe, I will correct my misrepresentation after if I am wrong, but that is my current understanding. Okay. Last question. You advocate that the commission should have used this rollover forward. Forward. Right? Yeah. Does that account for changes in mail volume? I believe it does. And I want to clarify, we were not saying they should necessarily use the roll forward model. What we said is this is a time-tested model for cost assessment that has been used in the past, and that they should have used that as a sanity check on this. Meaning, run it and use it to assess whether the density authority that they did land on was a good indicator of how to capture the cost they were trying to capture. Okay. Thank you. Judge Randolph, do you have any questions you'd like to ask at this point? No. Thank you. All right. So, why don't we hear from counsel for the U.S. Postal Service, Mr. Belt. Good morning, Your Honors, and may it please the court. The Postal Service has filed a separate petition challenging a different aspect of the commission's final rule. But we agree with the commission in several important respects. We agree that the initial price cap system failed, in fact, no one disagrees. We agree with the commission that it has the legal authority to address that failure by altering the price cap formula. And we support the alterations the commission made. They are helpful. But those adjustments are not themselves sufficient to achieve the financial stability objectives. To do that, another step was needed. Our price is needed, our price is subject to the price cap, needed to be allowed to reset to a compensatory and cost-covering level. The commission acknowledges that that additional step would help the system achieve the financial stability objectives. The commission also acknowledges that periodic rebasing between regulatory periods is an accepted practice in price cap regulation, but it refused to take that additional step. And so, because we believe that that decision, that refusal was not reasonable or reasonably explained, we ask that the case be remanded for further proceedings. So, is it your position that any rate-making system that doesn't cover the full cost of services arbitrary and capricious? Is that your position? Our position is that any rate-making system that doesn't allow the Postal Service a reasonable opportunity to cover its costs is unreasonable. And what would you rely on in the statute for that? I would rely on the financial stability objective, and I think there's both statutory language within that objective and the commission's interpretation, unchallenged interpretation of that language that leads me to that conclusion. So, let me start with the commission's interpretation. Okay. I want to hear your answer, but would you keep in mind the question I asked Ms. Kahn about this, which is, I want to hear you arguing about this. I do. But it seems to me, for Dale, you've got to show not just that the commission misapplied one factor, but that its balancing of all the factors together is somewhat arbitrary conditions. We agree with that, Your Honor. Okay. That's what I thought. Okay. And let me, I guess I'll take the first set of questions first about the financial stability objective alone, and then I'll shift to the balance question. As for the financial stability, our position is that, first of all, the Postal Service cannot be financially stable unless it's covering its costs. It follows that for the rate-making system then to achieve that objective, putting aside the balance, but for them to, for the system to achieve that objective, it has to at least give the Postal Service a reasonable opportunity to cover its costs. Now, we know this because the commission... And can I ask you, is your position that the reasonable opportunity must at this point encompass 100% recovery? It must. Yes. That our position is that the system must permit the Postal Service to cover all of its costs going forward. I'm not talking about past losses. I'm talking about from this point forward, it has to give us an opportunity to do that. Now, the commission's view, after all, the commission's finding that the system did not satisfy the financial stability objective was based on two things. One, that we were unable, the system prevented us from covering our total costs. That's what the commission referred to as medium-term financial stability, and that it did not give us an opportunity to retain earnings, which necessarily follows from the idea that we weren't covering our costs. So the commission's interpretation, that's their position too, that financial stability requires the ability to cover costs. But also, when you look at the statutory language, that objective speaks of maintaining financial stability. And maintaining financial stability presupposes that financial stability existed at the time that the system went into place. And that was, in fact, true at the time that the, under the 2006 Act, that the price-tax system was in place. At that time, the Postal Service was financially stable. It did, it was covering its costs. Also, when the language, the statutory language speaks of financial stability, including retained earnings. If retained earnings is included as part of financial stability, it necessarily follows that cost coverage is also part, is a necessary component of financial stability. So that's our view on the financial stability alone. Now, Terry, Judge Chadle, turning to your question about the balance, because that's, of course, the most, I think, in many respects, the most important question here. We agree with the commission that the, in fact, the statute is very clear that the objectives must be read in conjunction with each other. And for that reason, we're not asking for unregulated, unfettered pricing authority. Certainly, unregulated, unfettered pricing authority would set, would achieve the financial stability objective, but it would undermine other objectives. What we're saying is the commission didn't reasonably explain how satisfying financial stability by allowing us an opportunity, a reasonable opportunity to cover our costs would prevent the achievement of other objectives. So that's our view, that if financial stability can be satisfied without undermining other objectives, then, and meaning, but- Isn't that, isn't that, isn't that inherent in the commission's analysis? It's certainly their position. I mean, they've got quite a few objectives. Yeah. And in their view, allowing the system to, you know, allowing the post service to cover its costs would undermine the objective about maximizing incentives and the objective about predictability and stability and I'll take them one at a time. The, as for the first objective, the maximizing incentive, I think the commission's view is that leaving a gap, a going forward gap, leaving a gap between costs and revenues will encourage us to close that gap through costs. And I think that view, I think is inconsistent, both with any reasonable price cap theory that we're aware of, and it's inconsistent with the evidence and the commission's own findings. As for the theory, the commission itself recognized that price caps don't encourage efficiency by holding the regulated entities prices chronically under lock. And as for the efficiency, the efficiency incentives that are provided in that objective, they're provided by the existence of a price cap. The system that the commission has implemented in its final rule retains a price cap. If those incentives are maximized, you know, it doesn't just say have incentives, it maximizes incentives. And the commission has said that those, and that's consistent with the legislative history, that those incentives are maximized by the prospect of turning a profit. That's the incentive, the prospect of turning a profit, not just the fear of avoiding ceasing operations. I mean, were it otherwise, that would justify always ratcheting down the available pricing authority. And as for the evidence, if the idea is that the postal service should close the remaining gap through cost-cutting, which I think is the commission's view, the question is whether that can reasonably be done. The commission found that we cut costs and increased efficiency over the period that this, that the original system was in effect. It didn't find that we failed over any of those 14 years to exercise efficient management or that we, or prudent management or that we somehow didn't take advantage of cost-cutting opportunities that were there. It hasn't pointed to any cost-cutting opportunities that would close the gap in the future. And in fact, the commission recognized at several points that further cost-cutting would be difficult in light of our legal obligations and restraints. And it endorsed the only record evidence on this topic, which said that those opportunities are, wouldn't even come close to closing the gap. The sort of cost-cutting opportunities of that magnitude just aren't there under current law. And I'll also add as to the objective, that objective, it really doesn't make any logical sense. We have had a cost-revenue gap for 14 years. So I don't know why there's something about preserving that gap that's supposed to suddenly incentivize new cost-cutting ideas. Those incentives have been there. And also I'll just add that even with a rate reset and even with the adjustment factors that the commission implemented that we support, we have, we still have ample cost-cutting incentives. We'd still have more than $80 billion of private, of prior year losses of accumulated debt, including, you know, statutory payments that need to be made, debts that need to be paid back, and we'd still be to act efficiently in order to break even or better yet to beat the expectation of the price gap and maybe turn a profit. Moving to the predictability and stability of rates objectives, the commission's analysis doesn't square the sort of claim that there's a tension there with its own uncontested interpretation of that objective's meaning. The commission said that the objective requires the system to foster adjustments that are capable of being forecast regarding both the timing and the magnitude, and they don't have sudden or extreme fluctuations. A rate reset is not inconsistent with either of those prongs, or at least the commission doesn't say, doesn't explain why they are. I mean, it certainly can be forecast. I mean, the commission would announce both the permissible amount and the timing. It wouldn't, or at least needn't, fluctuate, whether it's a one-time rate adjustment or one that's phased in over a period of years. And the commission said that the objective, that objective is satisfied by a system with formula rates and a mechanism limiting sort of the magnitude of future price adjustments, and the revised system has those things. I mean, it has a price gap. And the commission itself proposed a rate reset back in 2018 without ever concluding that the idea of a rate reset, which again is a pretty common, at least in our understanding, pretty common practice in price gap regulation, but the commission never concluded that when it proposed the rate reset, that there was anything inherently inconsistent with the predictability and stability objective. The commission has the one 10-year review to have another review for six months later, a year later, two years later. Is that correct? They have the authority to review. Yeah. The 10-year review is not the last review. It's the first mandatory review. Something as appropriate thereafter. So, if after a year under the new system that the commission has put into effect, it appears that the postal service is still not fiscally solvent, there's nothing to prevent the commission from entertaining another petition by the postal service to increase the rates. Isn't that right? That's correct. But our view is that this system right now, the commission recognized that it has a responsibility in this 10-year review to implement changes necessary to and section 3622 as a whole says the system has to be designed to achieve these objectives. And in our view, the commission, while doing certain things that are helpful, missed a step that would actually be designed to achieve those objectives. So, I don't think that they can just say, well, we didn't achieve them now, but maybe we'll achieve them five years from now. I mean, the commission itself recognized that it had the obligation, having found that the system failed, which, again, no party disagrees with, to actually do something that fixes it. So, it basically needed a plan. And there just isn't a plan here that satisfies the objectives. I see that I'm over my time and into my rebuttal time. If the court doesn't have any further questions, I just, we ask that the case be remanded for additional proceeding as the rate is set. Thank you. All right. Thank you. Let us hear from counsel for the commission. May it please the court. I'm Dana Kersong for the Postal Regulatory Commission. The commission's order was plainly within its statutory authority, and it was a reasonable and reasonably explained response to the fact that the inflation-based price cap is getting in the way of the statutory objectives. I'm happy to answer any questions that the court might have. Otherwise, I think the court understands the issues here. Well, could you say something about their argument about the system, the difference between the regulatory and statutory systems? Certainly, Your Honor. So, the text of 3622D3 requires the commission to review the system. That's the system created by the statute of which the price cap is a part, after 10 years, and provides that a system, the commission rather, determines that the system is not working, is not achieving its statutory objectives. It can modify or adopt an alternative system. So, it can either change it or it can replace it entirely. The price cap is plainly under the of that system. And this, of course, was the legislative compromise. There was a House bill where the price cap could be jettisoned at any time if the commission made certain findings. There was a Senate bill that made it permanent, and the compromise was tried for 10 years. Do you think we need to use legislative history at all in this case? No, Your Honor. The language of 3622D3 is clear. The commission can adopt an alternative system as necessary to meet the objectives. That's what the commission— So, you draw no obstacles from the fact that there were statutory requirements, and then there was authority given to the commission to act. Because as I understand your argument, you're not fighting—not fighting, but not disputing—the commission's obligation to making whatever judgment it reaches to consider and explain the statutory objectives, factors, etc. So, why can the court simply treat the price cap requirement as something different? So, the price cap is a requirement for the system that the commission created under A-1. But that's the argument for the mailers. They understand that argument, as you presented it. But they say the structure of the statute, what Congress actually did, is inconsistent with the commission's reading. As I understand it, and counsel hasn't framed it this way, but Congress was required to say that any alternative system may exclude a price cap that is now a statutory requirement. So, respectfully, the statute here gives the commission the authority to adopt an alternative system. The price cap is part of the system that the commission can adopt an alternative to. You know, we know that was the legislative compromise, but also just looking at the D-3 would be superfluous in a couple of ways. The language, adopt an alternative system, really would not be doing any work because the commission already has the authority to modify the system, to revise the system at any time under A-3. So, it's not clear what adopt an alternative system would do if it couldn't be a system that is different from the system that the rest of 3622. In your opinion, what would Congress have had to say to make it clear that in the first 10 years, the commission had this modification authority? And after that, it had authority to adopt a system different than the one it had adopted by regulation? I'm not sure that I understand the question, Your Honor. Well, you know as well as I do that, you know, the Supreme Court has talked in some instances more than talked, it's held that where there is a fundamental impact on the economic system, affecting some major activities, the Congress has to be very explicit in saying that the agency has authority basically to disregard statutory requirements and come up with a new system on its own. That after finding the current system doesn't work, may reflect something entirely different than what Congress has conceived of as necessary for a long time. You don't think that's necessary, that any delegation is broad enough to allow the commission to just ignore the statutory requirements? That's what I want to be clear about. So D3, the second sentence of D3 gives the commission the authority to adopt an alternative system. And then if you look at 3622, what is this system that the commission can adopt an alternative to? That system included a price cap. And that's certainly the way the would otherwise be superfluous. 3622 D3 would otherwise be superfluous, second sentence, because A already gives the commission the authority to revise its regulations at any time. So we know this power to adopt an alternative system is something more. There are additional preconditions that the commission can only do this after determining by notice and comment that the existing system is not meeting Congress's objectives. And then Congress said what the commission needed to consider in adopting an alternative system. And it said it needed to consider the objective. Your argument is that the court ought to read the statute in light of all the steps Congress required before the commission by regulation could adopt a different system. A different system that did not include a price cap. Yes, Your Honor, that is certainly part of it. There are additional requirements to adapting a different system. So that's my question. Is that the critical point here? That were the court to have any doubt that that doubt should be mitigated by the fact that Congress left in place not only the factors Judge Patel has been discussing with counsel, but these procedural hurdles? That's right, Your Honor. Both the commission has to make the findings. They have to find that the alternative system is necessary. So there are limits on the D3 power that are not there under the AA power to just revise regulation. And then also D3 says both modify and adopt an alternative system. And adopt an alternative system would not be doing any work if it was just modifying the regulation. And, you know, as Senator Collins explained, but I'm trying to figure out what is the persuasive analysis that gets you there. In other words, is the response in part that Congress didn't have to say anymore in its statute than it said here? Because, and this is not the non-delegation point, but it not only limited what the commission could do by virtue of all these factors, but the procedural requirements were burdensome before the commission could move to adopt a different system. Yes, Your Honor. And the fact that those procedural requirements are there shows that this is some kind of additional authority that is different from the authority that is present under subsection A to revise the regulations, which, of course, the commission can do at any time. Well, I'm trying to respond to, in addition to the line of cases I alluded to, is our court has said that, you know, delegations have to be clear. And so what is the delegation here? And the mailers say, yes, there's lots of delegations, but nothing to say that Congress said the commission could rewrite the statutory reform. That's all I'm trying to figure out. What's your strongest argument to overcome that principle? I think it's the language of the second sentence of D3. If the commission determines after notice and comments that the system is not achieving the objectives in subsection D, taking into account the factors in subsection C, the commission may. I understand. I mean, that's in your argument. So it's just the second sentence of D3 that you rely on. The second sentence of D3, yes, Your Honor, the second sentence of D3 does that. And if you look at it also in the context of the entire 3622, you know, D3 is clear by itself. It's supported by 3622 as a whole, which talks about a system of which the price cap is a part and gives the commission authority to adopt an alternative system. And then, you know, what we're looking at here, this is under Chevron deference. And the question is whether the commission's understanding of the statute is reasonable. And I think this is clear. It's certainly a reasonable interpretation. The question initially is, has Congress clearly focused? That's what I've been focusing on. You get to step two, we're in a different ballpark. All right. So I think I have your answer. Anything, oh, David. Yeah. I just have two questions. I actually only had one until counsel answered your question there. I understood your brief to say, to argue that this, that the statute is clear, that we didn't need to get to Chevron too. Isn't that right? Yes, your honor. I'm sorry. I thought that we were, were positing a situation in which somebody didn't think the statute was clear. I'd like to just ask you one thing about the arguments that we've heard about arbitrary capricious. So you, you just heard counsel for the mailers and counsel for the postal service make their arguments that for each of their own reasons, that the commission's order is arbitrary capricious. I know your reaction to their brief. Do you have any reaction to arguments you heard today that you'd like to share with us? No, the, the commission's order here at it, it makes sense. It is a reasonable response to this problem that nobody really disputes that the price cap was standing in the way of the objective. All of the things that we've talked about today are things that the commission addressed in its order. And the commission reasonably explained why it wasn't doing each of these things. So I'm happy to talk about any, any questions, any, any places where there there's any question about what the commission said in its order, but the commission addressed all of these things in its order. And um, so I guess counsel, the question is, yes, it did. And now we have two parties arguing, well, maybe it did, but because of problems as to how it responded to some, that means that when you look at what the commission did as a whole, you cannot conclude that it's decision was not arbitrary. I mean, isn't that what you heard counsel saying? They don't argue that the commission didn't go one, two, three, four, five, they would have thought, but as I understood their argument is on fundamental points from their perspective, the commission missed the boat and those factors, findings are, are, are sufficient. And in some instances, they argue, require the court to conclude that even looking at everything else, the court did, the commission did what the commission's ultimate decision is was arbitrary and capricious. And I understood that's what judge Cato was trying to get the other two councils to focus on and you as well and telling us that the commission addressed each doesn't really answer. Certainly your honor. So I'm happy to address any particular one. So, so unless there's specific questions, I will start with, um, the postal services argument that commission should have given it more. And the commission explained it was concerned about, uh, rate rate increases that steep that it wanted to take a gradual approach that it was opening another rulemaking to consider additional authority. And it was committed to reviewing the entire system in five years or earlier if necessary, but that it was making a lot of changes at the same time right now. And there could be shocks or unintended consequences to that. There could be, um, effects on mailers and mail volumes, and it wanted to make sure that it was maintaining the benefits of the rate cap there or achieving the benefits of the rate cap could have of encouraging, um, encouraging, uh, low prices said, yes, we are not keeping the current rate cap because, uh, rate caps don't encourage efficiency by, uh, keeping the regulated entities prices chronically underwater. The mailers talked about that the postal service was not efficient enough, um, and that there wasn't enough to encourage efficiency. And the commission addressed that. It said, look, sometimes you need to spend money to save money. And the postal service has been forced to defer capital investments and use dated worn out and malfunctioning facilities, vehicles, and equipment. And instead of being able to invest in efficiency, the postal service has cut service standards, which is contrary to congressional objectives. Um, in terms of the roll forward, um, methodology, we addressed that at 2402 and 2403. We said, you know, that's about attempting to predict next year's losses. And these alleged deficiencies was specifically addressed by the commission and articulated in a manner that supported its judgment, not to adopt a position urge. Absolutely. Your honor. And the commission's bottom line here makes a lot of sense because nobody really disputes that the inflation-based price cap was standing in the way of achieving the objectives, which were not reasonable, uh, because they were below cost. And that was due to costs that were not within the postal services control and not linked to inflation. So the postal service couldn't retain earnings and it couldn't invest in efficiency, but the postal, the commission rather also had the concern about the effect on the system of changing too many things at once. And they said, we're going to do a limited additional authority under a modified rate cap that targets those specific losses that, you know, like inflation, the one folks on my Congress are beyond the postal services control while trying to maintain pressure to cut costs and prevent rates from going up too rapidly. And the commission recognized that there is a lot of uncertainty here and it will review the system again in five years or earlier if necessary. So in this highly technical area in which the commission was, uh, balancing a lot of things and making predictive judgments, it's choice of a gradual, uh, change with, uh, review really that, that underscores its wisdom and it also... Yes, finish. Yes, Sean. You may finish your sentence. May I ask that before you, before you conclude, would you tell me again what function D3 serves in light of subsection A? Certainly. So subsection A allows the commission to make its initial regulations, which are governed by, by D1, by the requirements, and to revise those regulations at any time subject to the requirements. D3 says after 10 years, study the system, and if it's not achieving the objective, you can adapt an entire alternative system. Okay. But just, I think I get it. The, the authority in A is totally discretionary with the commission about whether it wants to revise its regulations, but the authority under D3 is a requirement that it, uh, take a look at the, whether the regulation should be revised. It's also a... After 10 years. So D3 is also a grant of additional authority. It says if the system isn't meeting the objectives, the commission may modify the system or adapt an alternative. They could have done that under A. I mean, any time you're modifying the system, any time you change the regulations and you're putting in an alternative system, if you change the regulation. So I don't know that, uh, that argument goes anywhere, but the important thing is that D3 required a 10-year review, whereas A doesn't. D3 required a 10-year review, but the, the second sentence of D3 is also important, and that's where it allows the commission to adopt an alternative system, and we know that alternative system... I think I've got, I've got your argument. All right. Thank you. Okay. All right. Thank you, counsel. Thank you. All right. Counsel for the mailers, give you a couple of minutes. Okay. Thank you, Your Honor. I wanted to point out, and perhaps it may take, uh, re-listening to this transcript, but when, um, the PRC's lawyer was telling you what the statute said, she may have looked at what the PRC and the Postal Service did in their brief, which is to rewrite the statute. They used words like, um, rewrite the system established by this section. They used words like the, uh, statute authorized, D3 authorized, um, the commission to rewrite the entire section, but that's not what the statute says, and just as easily as the commission and the Postal Service were able to modify, write their briefs, and develop their illustrates how easy it would have been for Congress to make this clear, and I wanted to, to, uh, say that I, I think Judge Rogers, you're right, that a delegation needs to be clear, especially when it's something this profound, both with respect to the impact on the economy, but the impact on the Postal Service's ability to serve as the connective tissue, uh, for which it What, what argument was in their brief, Your Honor? The Supreme Court line of authority about expansive impact on the economic system. Well, I think we have in there that a delegation needs to be clear, yeah, a profound impact on the economy, and we certainly made the argument that and it has always had a strong policy hand in how coastal rates should be established, and to conclude that it basically said you can throw that entire statutory boundary to the curb and enter into this new no man's land where the commission can basically do essentially whatever it wants, because now you have these competing objectives, but that in turn requires ignoring all factors, etc. So, so your position, your, your position, as I get it, is that the only way Congress could have clearly authorized the Postal Commission to abandon the D-180 price cap is to have expressly said so. In other words, under your view, what, what D-3 should have said is that it can, uh, revise or adopt a new system, and it's not required, it should have added without regard to the price cap, right? That's your position. My position is they could have done it in a different way. No, but that's really what you're saying is that they haven't expressly authorized that. They said that to say they could come up with a revised system, an alternative system, excuse me, and only impose one requirement on it is not enough, but to be clear here, they had to actually relieve, expressly relieve the commission of the price cap obligation, right? No, Your Honor, our position is... Well, what should they have said? Give me an example. How could Congress have done it? I think what they said unambiguously accomplishes what I'm saying, which is it says what's established under this section can be redone, and I think that, that is unambiguous with... Now, suppose, suppose I don't think, suppose we think the statute, quite, quite contrary to the tone of the questions you may have heard, suppose, suppose we actually think, largely because of the arguments you've made, that the statute's ambiguous. What's your best argument that we shouldn't defer the commission? You agree that the commission is owed shed on debt, right? Your Honor, I agree that, my position is the statute's unambiguous, and I'm hearing you unambiguous. I'm hearing you. I ask you, suppose I don't agree with you about that. Suppose I think it's ambiguous. What's the best argument that it's, that the commission's interpretation is unreasonable? That's my question. That under Chevron 2, this court said in Pettit that the interpretation being offered needs to be consistent with the statutory purpose and the legislative history, and I submit that it is neither. It is not consistent with the statutory purpose, because the purpose of this statute was to impose a ceiling, and a ceiling that would affect costs. This court said that's the central focus of the PAPA. But suppose I don't agree with you about that. Suppose I, suppose I don't think the statute clearly requires the commission to, to regulate post, in its post-tenure period, subject to the price cap. Suppose I don't agree with that. How, why is what the commission's interpretation unreasonable? That's my question. You can't answer my question by saying the statute's clear. This is a hypothetical. Well, no, I'm not, I'm not telling you the statute's clear in answering the question. I'm telling you that the purpose of the statute was clear, and this court said so. In A&M versus PRC, it said, and I'm quoting, the central focus of the statute was tightly restricting postal service rate increases and increasing efficiency. That was the central part. Did we say that about the post-tenure reconsideration? No, but you, you said that about the statute, and the post-tenure review is part of the statute. Don't you have, don't you have a better answer to Judge Tatel's question about why it should not be? The one, one argument, unfortunately you haven't made it, but the, is that, well, the commission thought it was clear, and that's the only thing they did, was engage in statutory analysis. They didn't get to the next step of Chevron and balance the various policies involved, and so you don't defer to an agency under step two of Chevron, unless the agency engages in that sort of policy analysis, and they never did that under the interpretive portion of the commission's report. I think that's right, Your Honor. I also wanted to move to what I think is the second reason that I think Chevron, another reason, which would now be a third in light of what Your Honor has added, which is the legislative history. So the commission's lawyer just said to you that the House bill said the price cap was a permanent price cap that could only be undone if there, annually, if there was a notice, opportunity to be heard, and a finding that it was reasonable, equitable, and necessary. The Senate has said... You've addressed this already, haven't we, in my discussion with you about the power of the conference committee. We have. I just wanted to correct what the commission's lawyer just said to you, which is what they also said in their brief, which is that the House bill made the cap optional, and that's not true. The House bill had a cap... That's not an issue, counsel, at all. I mean, we can read the cap. Okay, Your Honor. I just wanted to let you know to make that correction. And then the last thing I wanted to say, because I know I'm out of time, is the about... And I think it really highlights why we think the price cap needs to stay in place, because once you enter into this terrain of it's just a free-floating set of competing objectives, it defies reason that Congress would have said, we're out of the mix now. Commission, add a price cap, next year, price cap plus, next year, price cap plus plus, next year, go back to the old system. That was the PRA, which was the cost of service regime, which is precisely what the commission's perspective seems to allow it to do. It can ignore entirely the requirements. It can ignore the limitations. It can ignore the work share discount provisions, which come after D3. And it's just a brave new world of the commission turning into the policymaker in this area, which is the role Congress has played for 230 years. All right. Thank you. Any questions? Judge Tatel? Judge Randolph? All right. Counsel for the Postal Service? Thank you, Your Honor. I just wanted to point out the mailers and their argument just now, we're talking about threats to the Postal Service or serving as the connective tissue of society. And the commission found that the threat to that connected Postal Service serving in that capacity is a system that failed to give it a reasonable opportunity to cover its costs. And the problem we have is the commission didn't fix that problem. It partially fixed it. It did something helpful, and we support that, but it didn't fix the system. Counsel stated that the commission was entitled to act incrementally. We don't disagree with that proposition in the abstract, but there still needed to be a plan. The commission never said in its orders below, never said that it was acting incrementally as to cost coverage. The increment that was being deferred had to do with a totally different type of pricing authority that would have, in theory, enabled the Postal Service to actually turn profits, conditioned on engaging in certain behaviors. Of course, that was all on the premise on the idea that this rulemaking gave the Postal Service an opportunity to cover its costs. The commission deferred that one out of concern of trying to do too many things at once, trying to shock some unintended consequences, but at no point did they say that cost coverage was the thing being deferred. Has Congress ever subsidized the commission within this 10-year period? Subsidized the Postal Service? Yeah, the Postal Service, I'm sorry. We have not received an operating subsidy during this time. The statute is always, there are certain things, free mail for the blind and overseas voting are partially subsidized in part because those are obligations that Congress separately imposed on the Postal Service. Those are reimbursements. Those are reimbursements for costs actually incurred. Then there was in the last year, because of expenses incurred particularly as to COVID, there was a reimbursement of those specific expenses. As to the statutory argument, I'll leave it obviously to the commission, but it isn't true. I think there was a suggestion in here that the commission never argued that if the statute's ambiguous, it's entitled to deference. That's in fact, it did make that. It pointed, it said that in its final order and its earlier orders, it made a sort of chevron set to a type of analysis. I think we were referring to the brief before us. Oh, fair enough. Well, even then, the commission's brief on appeal says the mailers cannot prevail even assuming that the plea is susceptible to multiple interpretations. At a minimum, the commission's interpretation is a reasonable reading of the statute. Thank you, Your Honor. Thank you, counsel. Most helpful, the court will take the case under advisement.
judges: Rogers, Tatel, Randolph